2020 IL App (1st) 171514-U

THIRD DIVISION
July 8, 2020

No. 1-17-1514

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 11379 |
| | ) | |
| DAVID FARR, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Ellis and Justice McBride concurred in the judgment.

ORDER

¶ 1   *Held*:   The judgment of the circuit court of Cook County is affirmed; the trial court substantially complied with Illinois Supreme Court Rule 401(a) when it informed defendant of the potential sentencing range of the charged offenses, provided defendant with a copy of the indictment, and where defendant clearly understood counsel would be appointed for him if he could not afford an attorney; the proper measure of the value of the stolen property was the full, fair cash market value of the real property taken; and the State adduced sufficient evidence of the market value of the stolen property at the time of the offense to prove defendant stole property valued in excess of $1 million.

¶ 2   Defendant, David Farr, was charged with two counts of theft, one count of financial institution fraud, three counts of continuing a financial criminal enterprise, twelve counts of burglary, and six counts of unlawfully clouding title. after he recorded allegedly fraudulent documents in the office of the Cook County Recorder of Deeds related to six homes that were in foreclosure in Chicago.  Farr obtained possession of the homes and used one as his personal

residence, and rented five others to other individuals. Following a jury trial defendant was found guilty of theft, financial institution fraud, and continuing a financial criminal enterprise. The circuit court of Cook County merged the convictions into one count of theft of property with a value in excess of $1 million, a Class X felony, and sentenced defendant to 14 years' imprisonment. In this appeal defendant argues he was improperly admonished when he waived his right to counsel and the State failed to prove the value of the property was in excess of $1 million dollars.

¶ 3     For the following reasons, we affirm.

¶ 4                                     BACKGROUND

¶ 5     At his arraignment the trial court asked defendant if he had "the financial ability to hire a private attorney" and defendant responded he did not. The court appointed the Office of the Cook County Public Defender to represent him and defendant responded "That would be fine." When defendant appeared in court before a different trial judge because of a recusal by the original trial judge, the judge again asked defendant if he had "the money to hire a lawyer to represent [him] in this case?" Defendant responded he did not and the court appointed the public defender to represent him. Defendant then asked if his bond could also be lowered. The trial court instructed defendant to speak to his attorney and offered to provide defendant with a copy of the charging documents. Defendant's attorney then entered his appearance, acknowledged receipt of the indictment, waived formal reading of the charges, and entered a plea of not guilty.

¶ 6     On the next court date defendant's attorney informed the trial court defendant had asked him to withdraw and that defendant wanted to represent himself. Thereupon the following exchange occurred:

> "THE COURT: What Class am I dealing with here?

MR. JAKALSKI [Assistant State's Attorney]: Class X.

THE COURT: Okay. You're charged with the offense should you be found guilty the minimum is six years, the maximum is 30, and it is not probationable so it's a penitentiary case so I don't know what the facts of the case are, I apologize.

MR. FARR [Defendant]: Yes.

THE COURT: I need to advise that if you represent yourself in these particular matters I would hold you to the same degree as I would hold any attorney that is in front of me representing—

THE DEFENDANT: I object to that due to Haines v. Kerns that I am not an attorney and you can not keep to the same standards of that of an attorney. That is case law as well.

THE COURT: Well, I disagree with that case, and I'm tell [*sic*] you I'm following the law of the State of Illinois when I indicate that to you there's no additional advantages to the individual that represents himself in the case.

THE DEFENDANT: Okay we'll [*sic*] I'm not representing myself *pro se*, sir. I'm representing myself in propria pur suri juris.

THE COURT: I understand you representing yourself in this. I recognize because I have been doing this a long time. Lots of people have lots of different ideas, and I respect that.

\* \* \*

[Defendant asked to "state some things on the record."]

- 3 -

THE COURT: Okay. I need to go through a series of questions with you, are representing yourself once I determine that you can represent yourself.

THE DEFENDANT: Yes.

THE COURT: Whatever you choose to do is fine okay. Okay how old are you?

THE DEFENDANT: If I answer these questions, am I still putting my [*sic*] under a certain type jurisdiction of the court by answering all of your questions?

THE COURT: You are under the jurisdiction of this court.

THE DEFENDANT: Is the jurisdiction assumed, sir, or it is by threat, duress, and coercion?

THE COURT: No, it's assumed. You are physically in front of me. I have jurisdiction.

THE DEFENDANT: But it also is by fact. [J]urisdiction has been discovered by threat, duress, and coercion because I am in one of the uniforms of the State in which I do not belong. I belong to the United States, the United States of Republic, which is a different government, and I'm also according to my birth certificate, which is authenticated, and which is authenticated in a seat of government that says full faith and credit, sir.

That means that my jurisdiction is different from the jurisdiction of this Court, and since my jurisdiction is from a different jurisdiction, the State now has the right to negotiate my affairs, and I have the right to negotiate my affairs the way I see fit.

However, those affairs have been violated due to those jurisdictions that I have just spoken of, and those two elements of jurisdiction that this Court have never proven by way of an affidavit those jurisdictions are personal jurisdiction subject matter jurisdiction and neither one of those jurisdictions have been proved by what signature at all.

However, I'm at this point to negotiate the terms of the contract which I've already sent to secretary -- not the Secretary of State, but the Attorney General of this State giving them a -- an analysis or a violation of fees that they ever should retain for any set reason that was not pertaining to a crime of that nature; however, today, sir –

THE COURT: Let me just interrupt you for a second, please.

THE DEFENDANT: Okay go ahead.

THE COURT: It appears that you have done vast research on this case, I will allow you to represent yourself.

THE DEFENDANT: Yes."

¶ 7    Defendant then moved to "withdraw the guilty plea and to terminate the counsel" and for "a change of venue to federal court." Defendant also asked the trial court to appoint standby counsel. The court denied defendant's request for standby counsel and explained that "otherwise you put an attorney, the standby attorney in jeopardy." Defendant responded "I understand." The hearing then proceeded with defendant attempting to litigate several matters including a motion to suppress evidence. The court informed defendant he would receive all of the documents tendered to the Public Defender on the next court date after redactions by the State. The State indicated it was prepared to tender 156 pages of discovery but in light of defendant's

self-representation it needed to redact certain information and would provide it to defendant on the next court date. At a subsequent court date defendant accepted "presentment on an indictment *** for value." At a court date in September 2016 defendant objected to his self-representation being characterized as "*pro se*." The trial court admonished defendant that he had "elected to represent [him]self in this matter" and asked if defendant understood that he had a right to counsel and had been told that at the beginning of the case. Defendant agreed that was correct and that an Assistant Public Defender had been appointed to him at one time.

¶ 8    Before trial began, the trial court informed defendant the State was proceeding only on Counts 1, 3, 5, and 19 through 24 of the indictment. The State dismissed the remaining counts. The State informed the court that the charging document had been tendered to defendant and defendant responded "I thought that was a true bill." The court then informed defendant it would read to the jury "in its entirety the counts of the indictment" the State was proceeding on. The court read the complete indictment on the relevant charges for the jury.

¶ 9    The properties at issue in this appeal may be designated, in no particular order, using the streets on which they are located in the city of Chicago as the (1) Wood property, (2) Esmond property, (3) Damen property, (4) 106th property, (5) Prospect property, and (6) Longwood property. If greater detail regarding an individual property is necessary to an understanding of our disposition of defendant's appeal we will provide it in context.

¶ 10    As it pertains to the issues on appeal, the undisputed facts adduced at trial were that defendant filed fraudulent paperwork in the office of the Cook County Recorder of Deeds (Recorder) on each property, defendant lived in the Wood property, and defendant rented or leased the remaining properties to other individuals. At trial, Donald Kaiser, a special agent with the Federal Bureau of Investigation (FBI) testified that defendant told him defendant owned the

Wood property. Special Agent Kaiser testified that regarding properties he did not move into, "he rented out or put people in." Special Agent Kaiser testified defendant told him that defendant told those individuals that defendant owned the properties. Defendant also stated that he "handles *** removal and replacement of locks" on the properties. Officer Charles Udell, a detective with the Chicago Police Department who is assigned to the financial crimes unit, testified he and a partner went to the Longwood property and recovered a lease of the property identifying defendant as the person who was the lessor or the landlord of the Longwood property.

¶ 11    Tondalaya Thomas, an employee of the Recorder's office, testified that filing a fraudulent document in the Recorder's office has "a huge impact because the banks, the homeowners depend on [the] record for the chain of title. So when you file a fraudulent document, you are clouding the chain of title. So it's difficult for a homeowner to sell the property, it's difficult for a homeowner to buy a property, it's difficult for the bank to even proceed on with the property." Thomas testified to similar documents defendant filed regarding the Wood, Esmond, 106th, Longwood, and Damen properties. Thomas testified the effect of defendant's filings was "like *** putting a lien on the property." She explained this makes it "hard for the people, if you try to sell the home—it's hard for you to try to sell the home because you [*sic*] trying to clear up the title. You're trying to uncloud the title."

¶ 12    Detective Patrick McCafferty, a detective assigned to the Chicago Police Department Economic Crimes Financial Crimes Task Force with the FBI, testified regarding his investigation into all six properties. Detective McCafferty testified fraudulent documents were filed in the Recorder's office on all six properties. He stated, "They were ownership documents, adverse possession documents, and other documents." Detective McCafferty identified and testified that

similar documents were filed in the Recorder's office as to all six properties. As part of his investigation, Detective McCafferty spoke to defendant. Defendant told Detective McCafferty "how he owned the other residences." Detective McCafferty testified someone other than the legal owner occupied all of the properties.

¶ 13    Detective Brian Finnegan of the Chicago Police Department Financial Crimes Unit identified a possessory mechanic's lien, a "notice of non-abandonment and secured interest of property," and an "affidavit, adverse possession" against the Wood property, and a "notice of non-abandonment and secured interest of property" against the 106th property, the Damen property, and the Longwood property. Detective Finnegan identified defendant's signature on all of the documents.

¶ 14    Randy Conatser testified he is the real estate owned foreclosure manager at Fannie Mae. Fannie Mae owned the Wood property beginning in May 2014; the Esmond property beginning in July 2013; and the Damen property beginning in July 2013. Fannie Mae sold those properties after July 1, 2014. The State asked Conatser if he recalled "the fair market value" of the Wood property and Conatser responded, "The unpaid principle balance on that property was $267,146, and we eventually told [*sic*] that property for $175,000." Conatser testified the sale took place after July 1, 2015. The State asked if Fannie Mae had any damages as a result of "these properties being taken over." Conatser testified that as to the Wood, Esmond, and Damen properties:

> "[W]e were deprived of the property so we therefore could not market the property, we could not sell the property. We've had to employ locksmiths after the fact when we did get possession back of the property in order to get back inside the property. We had to pay code violations and taxes. We had to actually

pay to have the property cleaned and trashed out once we did get possession of the property, not to mention lock boxes to the realtors that were cut off and disposed of somehow."

¶ 15    Sharon Kelly testified at defendant's trial that she is a field representative for a realty company. She testified that after the Wood property was vacated it was ultimately sold. She also testified that a home is more likely to be sold if it is vacant.

¶ 16    Karen Riney testified she is employed with Wells Fargo Bank. Wells Fargo held a loan on the 106th property. Wells Fargo foreclosed the loan and took ownership of the property in May 2012. The State asked Riney, "[W]hat was the value of the property *** in May of 2012?" and she responded, without objection, "$190,000." The 106th property sold after June 2015. Well Fargo foreclosed and took ownership of the Prospect property in September 2013. Riney testified the "appraised value" of the Prospect property at the time was $85,000 and the original loan amount on the property was $330,000. Wells Fargo conveyed the Prospect property to the Department of Housing and Urban Development in May 2014 for a transfer price of approximately $356,000. Regarding both the 106th property and the Prospect property, Riney testified Well Fargo was damaged as a result of the lack of being in possession of the property because it "had several expenses in regard to securing the property, changing the locks, boarding it up several times." Riney testified Wells Fargo was not able to sell the property while it was being possessed by someone else.

¶ 17    Lloyd testified she purchased the Longwood property in 2004 for $261,000. In 2013 the property was in pre-foreclosure. Lloyd reached a deal with her bank for a short sale of the Longwood property but the short sale did not happen because "squatters were in the property." Lloyd testified that her inability to get people who were living in her home out affected the short

sale of her home and caused it to "fall through." Lloyd eventually "just outright [lost] the house" on Longwood causing her "substantial financial injury."

¶ 18    Kevin Nolan testified that in fall 2014 he was a realtor in Chicago and he was responsible for the Damen property. In September 2014 he went to the property and saw the "for sale" sign was missing. Nolan testified that when his realty company listed the Damen property for sale the value of the property was "about three hundred and fifty-five thousand dollars." Nolan testified that price was based on a "broker price opinion" which is "like a report that we do and we take six comparables in the area, three that have sold in recent months and then three that are currently listed. We do our adjustments comparing on bedrooms, square footage, condition of the house." Barbara Thouvenall testified she is the managing broker and owner of the same realty company Nolan worked for. Fannie Mae owned the Damen property that her company serviced. Thouvenall testified that it was fair to say that if a property is unlawfully occupied you are unable to sell it. Thouvenall testified her company also received an assignment from Fannie Mae to service the Esmond property.

¶ 19    Thouvenall discovered the Esmond property was occupied and testified that it remained occupied through June 2015. The State asked if prior to the occupation Thouvenall was "able to make an assessment on the value of that property." She testified that she was, the property was vacant when she received it, and she did an evaluation report for the seller. Thouvenall described the process of assessing the value of a property as follows:

> "Well, you take the property and you look at it and then you try to find
> three properties that have sold recently that are similar to that property, similar in
> condition, location, number of bedrooms, number of bathrooms, and three

properties that are on the market now. You take all of that material and put it together and you come up with an estimate of the value."

Thouvenall testified that the type of estimate she described is called in the industry a Broker Price Opinion or BPO. Thouvenall formulated a BPO for the Esmond property, and her opinion of the value of that property, when "we first saw it [in 2013] when it was vacant it was worth about seventy-five thousand dollars." Thouvenall did another BPO in June 2015 after the Esmond property was no longer occupied. Her opinion as to the value of the property at that time was that "it was worth about a hundred and twenty thousand dollars." Thouvenall testified that the reason for the difference was "[b]ecause the market was finally going up. The worst of the market crisis was over. People could get loans again. There were buyers out there. People had jobs. They could go ahead and make a commitment to buy something again."

¶ 20    The State asked Thouvenall whether "generally any issues *** arise when you're attempting to sell a house that has been occupied by what people commonly refer to as squatters." Thouvenall testified there were issues that arise and described them as follows:

> "Well, there's a stigma to it. People are worried that something went on in the property or maybe a crime was committed or they don't know how the property was maintained. To go in and to see a property where there were people who were there not legally I think is upsetting to most people when they're thinking about home being a place of safety and security and happiness."

¶ 21    The State introduced the documents defendant filed in the Recorder's office into evidence as well as documents purported to be leases for the Longwood, Damen, and Esmond properties. Defendant presented no evidence. Following closing arguments, the jury found defendant guilty of financial institution fraud exceeding $1 million, guilty of theft exceeding $1 million, and

guilty of continuous financial crimes enterprise. At a subsequent hearing on posttrial motions defendant requested and the trial court appointed the Public Defender's Office to represent defendant for sentencing. Defendant's attorney filed a posttrial motion which the trial court denied. Following a sentencing hearing the trial court found that defendant's convictions merge into the count for Class X felony theft. The court sentenced defendant to 14 years' imprisonment. The court denied defendant's motion to reconsider sentence.

¶ 22    This appeal followed.

¶ 23                                    ANALYSIS

¶ 24    On appeal defendant argues (1) the trial court committed reversible, plain error in accepting defendant's waiver of his right to counsel for trial because the trial court failed to properly admonish him under or to substantially comply with Illinois Supreme Court Rule 401(a) (eff. July 1, 1984); and (2) the State failed to prove defendant guilty of theft in excess of $1 million where (a) the proper measure of valuation of the theft in this case is the "use value" of the properties and the State failed to prove their use value exceeded $1 million, or, alternatively, (b) the State failed to prove the value of the properties at the time of the offense exceeded $1 million. We address each argument in turn.

¶ 25                    Waiver of the Right to the Assistance of Counsel

¶ 26    First, defendant argues the trial court failed to inform him (1) of the charges he faced and (2) that he could continue to have counsel at no cost throughout trial, causing defendant to begin trial "without the benefit of fully contemplating the significance of his decision to proceed *pro se*" rendering his waiver of counsel invalid. Defendant argues the case must be remanded for a new trial at which defendant can be properly admonished. Defendant concedes he failed to preserve this error for review by raising it in the trial court and in a posttrial motion but argues

the trial court's error rises to the level of plain error.  A defendant's waiver of the right to the assistance of counsel is governed by Illinois Supreme Court Rule 401(a) which reads as follows:

> "Any waiver of counsel shall be in open court.  The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:
>
> (1) the nature of the charge;
>
> (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and
>
> (3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court."  IL S. Ct. R. Rule 401(a).

Although defendant failed to preserve this issue for review, "[t]he plain error doctrine allows for the review of a forfeited issue if error in fact occurred and: (1) the evidence was closely balanced; or (2) the error was so substantial that it deprived defendant of a fair trial.  [Citation.]" *People v. Pike*, 2016 IL App (1st) 122626, ¶ 108.  In this case defendant does not argue the evidence was closely balanced, only that the lack of counsel in the absence of a valid waiver constitutes " 'a plain and serious error.' "  This court has held that "[b]ecause the right to counsel is fundamental, we may review a failure to substantially comply with Rule 401(a) under the plain-error doctrine despite a defendant's failure to properly preserve such an error." *Id.* ¶ 109. However, "[b]efore addressing whether defendant's claim satisfies the plain error doctrine, defendant must first show that a clear or obvious error occurred." *Id.*  Accordingly, we turn to the question of whether any error occurred in the trial court's acceptance of defendant's waiver

of his right to the assistance of counsel. See *People v. Wright*, 2017 IL 119561, ¶ 87, quoting *People v. Thompson*, 238 Ill. 2d 598, 613 (2010) (" 'The first step of plain-error review is determining whether any error occurred.' "). "We review a trial court's determination on the issue of self-representation for an abuse of discretion. [Citations.] An abuse of discretion occurs only where the trial court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Perkins*, 2018 IL App (1st) 133981, ¶ 44.

¶ 27　First, defendant argues the trial court never told him what the nature of the charges against him were. Specifically, defendant argues the trial court failed to inform him "of the name of the offenses with which he was charged, let alone the specifics of the allegations with regard to the locations and addresses of properties, and the alleged value of the properties." The State responds the record indicates substantial compliance because defendant received the charging instrument in this case which contained all 24 counts against defendant and prior to jury selection the trial court read every count in the indictment to the jury in defendant's presence. Defendant agrees that only substantial compliance with Rule 401(a), rather than strict compliance, is required. See *People v. Maxey*, 2018 IL App (1st) 130698-B, ¶ 41, citing *People v. Campbell*, 224 Ill. 2d 80, 84 (2006). Our "supreme court has held that 'substantial compliance will be sufficient to effectuate a valid waiver if the record indicates that the waiver was made knowingly and voluntarily, and the admonishment the defendant received did not prejudice his rights.' [Citations.]" *Id.* ¶ 41. We find there was substantial compliance with Rule 401(a) in this case.

¶ 28     "[T]he entire record may be considered in determining whether or not there was an understanding by the accused of the nature of the charge." *People v. Krantz*, 58 Ill. 2d 187, 192 (1974).  In *People v. Wright*, 2017 IL 119561, ¶ 53, our supreme court found as follows:

> "Similar to *Coleman*, *Johnson*, and *Haynes*, and in marked contrast to *Campbell*, under the circumstances in this case, there was substantial compliance with Rule 401(a).  After defendant initially asserted that he desired to proceed *pro se*, *the trial court provided him with a copy of the charging instrument* and admonished him that he was subject to a possible sentence of 21 to 60 years for the charged offenses and that he was entitled to have a public defender represent him." (Emphasis added.)  *Wright*, 2017 IL 119561, ¶ 53.

¶ 29     In this case, the trial court also provided defendant with a copy of the charging instrument.  (We note the colloquy upon which our supreme court relied in *Wright* to find substantial compliance with Rule 401(a) did not include a reading of the charges.  See *Wright*, 2017 IL 119561, ¶¶ 51-52.)  In *Krantz*, where the question was whether the defendant understood the nature of the charge prior to accepting a guilty plea (*Krantz*, 58 Ill. 2d at 191), our supreme court held as follows:

> "Though no formal inquiry had been made of the defendant as to whether he understood the nature of the charge, this court affirmed the conviction.  It was said:  'The recital of the anticipated testimony of the witnesses for the prosecution, in the presence of the defendant and his attorneys, without protest and indeed with acquiescence; demonstrates to our satisfaction that the defendant's conduct falls within the charge to which he pleaded guilty." *Krantz*, 58 Ill. 2d at 193.

*Krantz* is instructive because here, again, prior to the start of trial (that is, before *voir dire* began (see IL S. Ct. R. 431 (eff. July 1, 2012), *People v. West*, 397 Ill. App. 3d 289, 295 (2009)) the trial court recited the precise charges detailed in the indictment against defendant, without protest and "indeed with acquiescence," and this too "demonstrates to our satisfaction" that "the trial court satisfied the requirements of Rule [401] in informing [defendant] of *** [the] nature of the charge against him." See *id.* at 193. This court has also found substantial compliance with Rule 401(a) where the defendant is "fully admonished" of the nature of the charges "prior to the start of trial." *People v. Phillips*, 392 Ill. App. 3d 243, 263 (2009).

¶ 30    "The essentials have been complied with if an ordinary person in the circumstances of the accused would understand them as conveying the information required by the rule." *Krantz*, 58 Ill. 2d at 193. Further, just as in *Phillips*, in this case, "defendant does not claim that he suffered any prejudice" from allegedly not being told "the names of the offenses with which he was charged, let alone the specifics of the allegations with regard to the locations and addresses of properties, and the alleged value of the properties." See *id.*, citing *People v. Johnson*, 119 Ill. 2d 119, 134 (1987) (substantial compliance found where the defendant suffered no prejudice). We note that "[d]efendant carries the burden of persuasion under both prongs of the plain error rule." *Maxey*, 2018 IL App (1st) 130698-B, ¶ 36.

¶ 31    Additionally, there is nothing in the record to indicate defendant was not aware of or did not understand the information. See *id.* This court determines "whether there has been substantial compliance in any given case [based] upon the facts before us in light of the purpose of the rule we are called upon to interpret." *Id.* ¶ 43. "The purpose of the rule is to ensure that a waiver of counsel is knowingly and intelligently made." (Internal quotation marks and citations omitted.) *People v. Reese*, 2017 IL 120011, ¶ 62. Defendant has not argued or pointed to

anything in the record to indicate his waiver of counsel was not knowing and intelligent because defendant allegedly did not know the nature of the charges against him. Therefore, this argument fails.

¶ 32    Next, defendant argues the trial court did not substantially comply with Rule 401(a) because the trial judge did not tell him that "if he was indigent, [he had the right] to have counsel appointed for him by the court." Defendant asserts "there is no indication on the record that he knew that counsel was going to be available to him free of charge because of his indigence throughout trial." The State responds defendant "admitted in open court that he had been told he had a right to counsel and that he had a public defender appointed to represent him before he elected to represent himself." The State notes two different trial judges asked defendant whether he could afford to hire a private attorney and, when defendant responded he could not, the court appointed the Office of the Cook County Public Defender to represent defendant. Thus, the State argues, based on this record, defendant's decision to waive his right to have counsel appointed to represent him was made knowingly, intelligently, and voluntarily. We agree. See *supra* ¶ 5.

¶ 33    In *People v. Anthony*, 42 Ill. App. 3d 102, 104 (1976), the defendant argued "the [trial] court's failure to explain to him the indigency requirements for appointed counsel deprived him of the opportunity to consider the availability of such counsel." This court rejected that argument noting "that the [trial] court advised [the defendant] that it would appoint a public defender if it determined that he could not afford an attorney." *Anthony*, 42 Ill. App. 3d at 104. This court found that the defendant "only stated that he did not wish to be represented by a lawyer." *Id.* The court held that the legal authorities the defendant cited did not support his contention that if the defendant has stated that he does not desire to be represented by a lawyer

*following the court's admonition that it will appoint an attorney if the defendant cannot afford one* the court must either advise the defendant of the indigency requirements or make a determination of the defendant's indigency. *Id.* Defendant has not cited any authority which supports the proposition that where the trial court informs the defendant that it would appoint the public defender to represent him if he cannot afford an attorney (twice), that is not sufficient to support a finding of substantial compliance with the rule. See *People v. Brzowski*, 2015 IL App (3d) 120376, ¶ 46 ("Finally, defendant was never told during either trial that he had 'the right to counsel and, if he is indigent to have counsel appointed for him by the court,' as required by the Rule. Ill. S. Ct. R. 401(a)(3) (eff. July 1, 1984)."). Here, the court twice asked defendant if he could afford an attorney and defendant twice answered no before the court appointed an attorney to represent him. Also, once again defendant failed to argue how he was prejudiced by allegedly not knowing that if he was indigent he had the right to have counsel appointed to represent him, an assertion refuted by the record. See *Maxey*, 2018 IL App (1st) 130698-B, ¶¶ 36, 41 (the defendant carries the burden of persuasion under the plain error rule; and substantial compliance will be sufficient to effectuate a valid waiver where the admonishment the defendant received did not prejudice his rights). Accordingly, this argument also fails.

¶ 34    Finally, defendant asserts in conclusory fashion that the trial judge in this case never told him the sentencing range for burglary and that this "was valuable information that would have been essential in negotiating a plea agreement." This argument fails for two reasons. Primarily, "[d]efendant has forfeited th[is] contention[] by failing to cite authority and by failing to present a developed argument." *People v. Olsson*, 2016 IL App (2d) 150874, ¶ 22. Even if not forfeited, this court had held that where the trial court "clearly admonished [the] defendant of the maximum penalties allowed *** he was not prejudiced [by the failure to admonish him of a

lesser sentence he could receive] when he received less than the maximum sentence." *People v. Phillips*, 195 Ill. App. 3d 560, 562 (1990).

¶ 35    We find the trial court substantially complied with Rule 401(a) in this case when it explained the maximum Class X penalty and that defendant has failed to demonstrate any prejudice from any alleged defect in the admonitions.  Therefore, the trial court's acceptance of defendant's waiver of his right to counsel is affirmed.

¶ 36                              Valuation of the Stolen Property

¶ 37    We now turn to defendant's argument the proper means of valuing the stolen property in this case was the "use value" of the property and, nonetheless, the State failed to prove the "market value" of the stolen property at the time of the offense beyond a reasonable doubt.  "The State has the burden to prove every element of the offense beyond a reasonable doubt." *People v. Cunningham*, 2019 IL App (1st) 160709, ¶ 28.

> "Generally, we view a challenge to the sufficiency of the evidence on an element of the charged offense in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  [Citation.]" *People v. Toliver*, 2016 IL App (1st) 141064, ¶ 13, citing *People v. Amigon*, 239 Ill. 2d 71, 78 (2010) ("A reviewing court may only overturn a jury's finding by concluding that no reasonable trier of fact could have found the requisite elements of the offense proven beyond a reasonable doubt.").

The State charged defendant with theft, a Class X felony.  Theft is defined, in pertinent part, as follows:

> "(a) A person commits theft when he or she knowingly:

(1) Obtains or exerts unauthorized control over property of the owner; or

(2) Obtains by deception control over property of the owner;

* * *

and

(A) Intends to deprive the owner permanently of the use or benefit of the property; or

(B) Knowingly uses, conceals or abandons the property in such manner as to deprive the owner permanently of such use or benefit; or

(C) Uses, conceals, or abandons the property knowing such use, concealment or abandonment probably will deprive the owner permanently of such use or benefit.

(b) Sentence.

* * *

(6.3) Theft of property exceeding $1,000,000 in value is a Class X felony.

* * *

(c) When a charge of theft of property exceeding a specified value is brought, the value of the property involved is an element of the offense to be resolved by the trier of fact as either exceeding or not exceeding the specified value." 720 ILCS 5/16-1 (West 2016).

¶ 38    "It is well-settled law that the value of stolen property is the fair cash market value at the time and place of the theft." *People v. Perry*, 224 Ill. 2d 312, 336 (2007). Defendant argues he "never took possession of the entire properties." Defendant states his fraudulent paperwork was insufficient to give him "control of a possessory interest in the entire properties" and, therefore,

the State "proved, *at most*, that [defendant] committed theft as to the rental/use value of the properties." (Emphasis added.) Defendant relies on our supreme court's decision in *Perry*, which he states is controlling. In this case defendant argues that his "occupation of the properties concerned [only] the use of the properties." Defendant argues he "did not obtain permanent possession from the owners of any of the properties," therefore "the State should have presented evidence of the use value of the properties." We disagree.

¶ 39    In *Perry*, after having first determined that "the use of a hotel room is property within the meaning of [the theft] statute" our supreme court turned to "whether, when the property at issue is the use of a hotel room, it is possible to permanently deprive the owner of its use or benefit." *Id.* at 334. "If not, [a] defendant cannot be convicted under section 16-1(a)(2)(A) for its theft." *Id.* Again, a person commits theft when he or she knowingly obtains or exerts unauthorized control over property of the owner and intends to deprive the owner permanently of the use or benefit of the property or uses the property in a manner as to, or knowing such use probably will, deprive the owner permanently of such use or benefit. 720 ILCS 5/16-1 (West 2016).

¶ 40    To answer the question of whether the State proved the permanent deprivation element of the offense of theft our supreme court began with holding that the defendant was "mistaken when he suggest[ed] that the statute requires permanent control by the defendant or permanent loss of possession by the owner." *Perry*, 224 Ill. 2d at 335. The court noted that the property at issue was "the *use* of a hotel room" (emphasis added) (*id.*) and that a hotel room "can be analogized to a store's inventory of goods" (*id.*). The court stated that the hotel has rooms "which it can rent to members of the public" and so "[o]ne night in one room is a thing of value" (*id.*) and, "thus, within the statutory definition of property in section 15-1" (*id.* at 332). Our supreme court found that "each night of occupancy that is obtained by [theft by] deception

permanently deprives the owner *of the beneficial use of the hotel room.*" *Id.* at 335-36. In *Perry*, the defendant acknowledged that "the hotel 'was deprived of the rental value it should have received for the room on each of the nights' that he and his family [fraudulently] occupied the suite" and our supreme court did not quibble with that characterization of the hotel's loss. *Id.* at 336. The court found no authority for the defendant's suggestion the State had the burden to prove the hotel room would have been occupied had the defendant and his family had not been there. *Id.* Our supreme court then relied upon the rate for the room "negotiated by [the] defendant" (*id.*) to find that the record supported finding "that the value of the stolen property exceeded $10,000" (*id.*).

¶ 41    The residences at issue in this case, however, cannot fairly be "analogized to a store's inventory of goods." First, in *Perry*, the defendant did not obtain control over the entire hotel— he only obtained control over one room. On an individual room basis the hotel could do no more than "rent [it] to members of the public 365 nights each year." See *id.* at 335. Thus, all that the defendant in *Perry* deprived the hotel of was "the rental value it should have received for the room on each of the nights" the defendant and his family occupied the room. See *id.* at 336. In this case defendant obtained *control* over the entire residence regardless of whether he obtained an *ownership* interest in the residence. Contrary to his assertion the evidence proves defendant did control the full value of the properties and it was only his "attempts" at obtaining title ownership that were futile.

> "For purposes of theft, the concept of obtaining or exerting control 'includes but is not limited to the taking, carrying away, or the sale, conveyance, or transfer of title to, or interest in, or possession of property.' 720 ILCS 5/15-8 (West 2010). This concept applies 'to the initial taking or carrying away

[citation], and *** the unauthorized possession need not begin at the time of the original taking.' [Citation.] It does not matter how briefly the defendant controlled the property, as long as the defendant did have control at some point. See *People v. Murray*, 262 Ill. App. 3d 1056, 1061 (1994) ('[T]o establish the crime of theft the State must prove that the defendant obtained "unauthorized" control, however brief, over the property of another with the intent to permanently deprive the owner of the use and benefit thereof.')" *People v. Oglesby*, 2016 IL App (1st) 141477, ¶ 216.

¶ 42 Defendant's control over the entire residence (home and land) deprived the true owners of more than "the rental value" they could have received had they even sought to rent the properties. The evidence clearly established the properties were for sale, not rent. Regardless of the intent of the owner of a residential property, unlike a single hotel suite in a large hotel, it is not something the true owner can *only* rent or lease to another. "A common idiom describes property as a 'bundle of sticks'—a collection of individual rights." *Schweihs v. Chase Home Finance, LLC*, 2015 IL App (1st) 140683, ¶¶ 31, 41.

"Property, in the constitutional sense, is frequently described conceptually as a 'bundle of sticks,' with each stick in the bundle representing a different right that is inherent in the ownership of the physical thing that we typically think of as property, such as a parcel of land. Those rights include the right of possession, the right to use the property, the right to dispose of or transfer the property, and the right to exclude others from the property. Although every stick in the bundle is potentially important in assessing a takings claim, the right to exclude others, including the government, is frequently described as the most 'fundamental' and

'treasured' of all property rights." Kristine S. Tardiff, *Analyzing Every Stick in the Bundle: Why the Examination of A Claimant's Property Interests Is the Most Important Inquiry in Every Fifth Amendment Takings Case*, Fed. Law., October 2007, at 30, 31 (2007) (and cases cited therein). See also *United States v. General Motors Corp.*, 323 U.S. 373, 378 (1945) (property rights include "the right to possess, use and dispose of it").

¶ 43    Defendant does not, and cannot, dispute that he took control of the properties at issue in this case. The evidence is undisputed that defendant changed the locks on the residences. The evidence also established that defendant deprived the owners of the properties of their right to possess, transfer, dispose of, use and, most importantly, exclude others from the property. The evidence established beyond a reasonable doubt that defendant erected no trespassing signs on the properties. Defendant turned authorities and other persons authorized to be on the properties (real estate agents the owners assigned to the properties) away. The occupancy of the properties made them at minimum more difficult to sell. Finally, the owners did not authorize any of the occupants of the properties to be on or to reside in the properties.

¶ 44    Additionally, "permanent possession from the owners" is not required to establish "control" of the property as defendant suggests, "as long as [defendant] did have control at some point" with "the intent to permanently deprive the owner of *** the benefit thereof." See *Oglesby*, 2016 IL App (1st) 141477, ¶ 216. Although defendant does not dispute the "permanent deprivation" element of theft we find the evidence in this case is sufficient to prove beyond a reasonable doubt that defendant had both control and possession of all of the properties with the intent to permanently deprive the owners of their use and benefit. The evidence established defendant filed paperwork purporting to demonstrate adverse possession of the properties.

Adverse possession "means the assertion of ownership incompatible with that of the true owner and all others." *Knauf v. Ryan*, 338 Ill. App. 3d 265, 269 (2003). "[O]btaining ownership of land through adverse possession means that the original owner has been divested of his title." *Nationwide Financial, LP v. Pobuda*, 2014 IL 116717, ¶ 33. Despite the fact defendant's paperwork was incompetent it is sufficient evidence from which a reasonable trier of fact could infer defendant's intent to permanently deprive the true owners of the use or benefit of the properties. See *People v. Reed*, 2018 IL App (1st) 160609, ¶ 38 ("evidence of intent will often be proven by the surrounding circumstances of the event").

¶ 45    We find Illinois law clear in this area and therefore have no need to turn to the foreign authority defendant cites in support of his argument on appeal. We hold the evidence is sufficient to prove beyond a reasonable doubt that defendant exerted unauthorized control of the properties with the intent to deprive the owners permanently of the use or benefit of the properties beyond the ability to rent the properties to others irrespective of whatever use defendant put the properties to while he was in control of them; and, therefore, that the correct measure of damages was the "fair cash market value at the time and place of the theft." *Perry*, 224 Ill. 2d at 336. Accordingly, we turn to defendant's argument the State failed to prove the fair cash market value of the properties at the time defendant had control of them.

¶ 46                    Sufficiency of the Evidence of Fair Market Value

¶ 47    Defendant next argues the State failed to prove the fair market value of the properties at the time of the taking because the evidence "lacked any detail and assurances that the value [testified to by the State's witnesses] was equal to the fair market value of the property" at the time of the offense. "[V]alue is a material element of the offense which must be specifically found by the jury." *People v. Harden*, 42 Ill. 2d 301, 306 (1969). The State initially responds

defendant has in fact raised a challenge to the adequacy of the foundation for its witnesses' testimony, rather than a challenge to the sufficiency of the evidence, which defendant has forfeited by failing to raise an objection to the foundation for the witnesses' testimony in the court below. *People v. DeLuna*, 334 Ill. App. 3d 1, 19 (2002) (where the defendant never objected to foundation for opinion the "issue of foundation is waived"). We reject the State's contention defendant's argument goes to the foundation for the witnesses' testimony. We believe the issue raised is the sufficiency of the evidence of market value at the time of the offense. Nonetheless, to the extent any of defendant's contentions on appeal do go to the foundation for the witnesses' testimony, they are forfeited.

¶ 48    Turning to the merits, first, as to the Wood and Longwood properties, defendant argues the State's evidence provided values "at a time other than the time of the offense." The indictment alleged defendant committed the theft "on or about January 1, 2012 and continuing on through June 30, 2015." Conatser testified that the Wood property sold for $175,000 in November 2015, and Lloyd testified she purchased the Longwood property in 2004 for $261,000. Defendant argues that "[f]or both the Wood and the Longwood property, therefore, the State failed to offer evidence of a proper value at the time of the offense." The State cites *Harden*, 42 Ill. 2d at 305-06, for the proposition that "[t]he opinion testimony of one who has sufficient knowledge of the property and its value to give a reasonable estimate, received without objection, is sufficient, in the absence of contrary evidence, to establish value." In this case, the State argues, its witnesses had more than sufficient knowledge to assess the value of the properties and their testimony went uncontradicted and unrebutted; therefore, the evidence amply supported a valuation of the six homes as exceeding $1 million.

¶ 49 "Generally, where the value of property is relevant, it must be proved, and the proof must show the fair cash market value at the time and place of the theft." *People v. Newton*, 117 Ill. App. 2d 232, 235 (1969).

> "It is clear that 'value' in the statute means 'fair cash market value' and that such value must be proved by the state in order to establish a felony rather than merely a misdemeanor. [Citation.] Cost is not the standard, whether it be original cost or replacement cost. [Citations.] On the other hand, cost along with testimony as to the condition, quality and obsolescence or modernness may afford a basis for a finding of value at the time of the offense." *People v. Cobetto*, 32 Ill. App. 3d 696, 701 (1975).

We look to the record as a whole to determine whether the evidence was sufficient to establish the fair cash market value of the property at the time of the offense. *Id.* at 701-02.

¶ 50 In *People v. Dell*, 77 Ill. App. 2d 318, 324 (1966), the defendant argued her conviction must be reversed because "there was no evidence of the fair cash market value of the [property] at the time and place of the theft." The property at issue was "129 pairs of trousers, having a value exceeding One Hundred Fifty Dollars." *Id.* at 321. The "only evidence introduced as to the value of the pants was the testimony of Norman Cutler." *Id.* at 325. "Cutler was *** asked as to his opinion as to the 'value' of the trousers in People's Exhibit No. 1. He replied '$250'. No evidence was offered by the defense to rebut that evaluation." *Id.* The court found:

> "It has been held that testimony in regard to the value of stolen property may be received in response to a question as to its 'value' or 'worth' and be sufficient proof, by itself, of the market value at the time of the alleged crime in the absence of any objection. [Citations.]

In view of his past experience in the business, Cutler was qualified to give his opinion as to the value of the trousers before the court, and, since no evidence to the contrary was offered, that opinion, as expressed, was adequate evidence of the market value of the property." *Dell*, 77 Ill. App. 2d at 325.

¶ 51 In this case, as to the Wood property, Conatser testified Fannie Mae came into possession of the property on July 2, 2013, during the period alleged in the indictment. The State specifically asked Conatser, "do you recall what the fair market value of that property was when Fannie Mae had taken it over?" Conatser testified, "The unpaid principle balance on that property was $267,146, and we eventually [sold] that property for $175,000" after July 1, 2015. Conatser also testified a buyer took sale of the Wood property in November 2015. Defendant offered "no evidence to the contrary." *Dell*, 77 Ill. App. 2d at 325. On appeal, defendant does not challenge Conatser's qualifications to give his opinion as to the value of the Wood property. We concede Conatser's testimony consists of an unpaid balance on a loan made at an unknown time and that the final sale price occurred a few months after the period of the ongoing theft alleged in the indictment.

¶ 52 However, "[i]t is not the role of the reviewing court to retry the defendant. [Citation.] Rather, it is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *People v. Gray*, 2017 IL 120958, ¶ 35. "[A] reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses. [Citation.]" *People v. Brown*, 2013 IL 114196, ¶ 48. Here, the jury could reasonably infer that the fair market value of the property at the time of the theft was the eventual sale price of the property just a few months later. The trier of fact is entitled to draw reasonable inferences from both direct, and

circumstantial, evidence, and a court will not disregard those permissible inferences merely because other inferences might have been drawn unless those findings are manifestly without support. See *Rhodes v. Sigler*, 27 Ill. App. 3d 1, 3 (1975), *Berry v. Industrial Comm'n*, 99 Ill. 2d 401, 407 (1984). In this case, we find sufficient evidentiary support for a reasonable inference that the sale price Conatser testified to was the market value at the time of the theft. The evidence established the owner's desire and attempt to sell the property during the period of the theft and the relevant sale occurred shortly after the end of the period alleged in the indictment. There is evidence is the record that during the relevant time period the housing market was "going up" but the unpaid balance on the existing bank loan was significantly higher than the ultimate sale price. The trier of fact heard evidence about the general nature of the home, regardless of any "improvements" during the period of the theft, and the character of the neighborhood. We note that home values are not a matter that are outside the ken of the average juror. "[A] trier of fact is allowed to consider the evidence in light of his or her own knowledge and observations in the affairs of life." *People v. Newton*, 2018 IL 122958, ¶ 28.

¶ 53    Further, the jury could reasonably infer that the sale price a few months after the theft ended reflected fair market value at the time of the theft. Fair cash market value is a question of fact for the trier of fact and the trier of fact may rely on the competent, relevant evidence before it along with reasonable inferences drawn therefrom.[1] Defendant does not argue it is

---

[1]    "The standard for determining the value of property at the time and place of the theft is the property's fair cash market value and evidence presented to support a conviction for a felony amount, although given through the testimony of witnesses not addressing the precise fair cash market value, is sufficient. [Citation.] Wooldridge testified that he owned the car, he identified it, described it, and said that it was worth more than $300. He was competent to testify to the value of the car and the weight to be given to his testimony was for the jury to decide." *People v. Adams*, 156 Ill. App. 3d 444, 451 (1987), vacated on other grounds, 119 Ill. 2d 560 (1988).

unreasonable to infer the fair market value at the time of his theft of the Wood property from the sale price "several months later" or that the sale was not sufficiently close in time to the period alleged in the indictment to establish the fair market value at the time of the theft, especially in light of the unrebutted testimony. See *Dell*, 77 Ill. App. 2d at 325. See also, generally, *Munjal v. Baird & Warner, Inc.*, 138 Ill. App. 3d 172, 186 (1985) ("there was no evidence presented as to the value the property had with the defects at the exact time of sale. However, Krueger's estimates were made within nine months of the sale. We do not think such a time period was enough to render Krueger's opinions irrelevant or mislead the jury as to the value the property"), overruled on other grounds by *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 192 (2005). The jury's verdict is based on a reasonable inference from the evidence. This court will not substitute its judgment for that of the jury on matters involving reasonable inferences from the evidence. *People v. Green*, 2017 IL App (1st) 152513, ¶ 102. Defendant's arguments as to the Wood property fail.

¶ 54   Turning to the Longwood property, we agree with defendant that Lloyd's testimony, alone, as to its "purchase price [in 2004] was *** an insufficient measure of the property's value between 2012 and 2015." "As the court in [*Brown*], stated: 'The criterion used in determining value in theft cases is the fair cash market value at the time and place of the theft. [Citations.] Cost is not the standard, whether it be original cost or replacement cost. [Citations.]' " *People v. Castro*, 109 Ill. App. 3d 561, 568-69 (1982). However, this court does not look to Lloyd's testimony alone. In *People v. Cobetto*, 32 Ill. App. 3d 696, 701 (1975), the court stated:

> "In the instant case none of the questions directed toward the witnesses on the issue of value referred to fair cash market value. We must therefore look at the record as a whole to determine whether the testimony concerning value which

was elicited by these questions referred to original cost, replacement cost, fair cash market value or some other standard of measuring value." *Cobetto*, 32 Ill. App. 3d at 701.

Therefore, we must look to the record as a whole to determine whether the State elicited sufficient evidence to establish beyond a reasonable doubt the fair cash market value of the Longwood property at the time of the offense. Our supreme court, which reversed the lower court's decision in *Cobetto*, held that:

"The standard for determining whether the value of property at the time and place of the theft exceeded the statutory amount *** is the property's fair cash market value. [Citation.] Evidence presented may be sufficient, however, to support a conviction for the felony amount, though the testimony of witnesses was not addressed precisely to the 'fair cash market value.' [Citations.]" *Cobetto*, 66 Ill. 2d at 491.

We are also reminded by our supreme court not to engage in "sheer formalism" in making that determination. *Cobetto*, 66 Ill. 2d at 491. Our supreme court quoted the dissenting appellate court justice in that case who wrote that, "To say that the value of the property involved *** does not exceed $150 requires that one abandon common sense in favor of stringent technicality." (Internal quotation marks and citation omitted.) *Id.* We are also mindful that "the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] In that case, a reviewing court will not reverse a criminal conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt." *People v. Rowell*, 229 Ill. 2d 82, 98 (2008).

¶ 55    Regarding the Longwood property, the "other proof" bearing on the "valid finding as to [fair cash market] value] at the time of the offense (see *Todaro*, 14 Ill. 2d at 601), in addition to Lloyd's testimony as to "cost alone" (*id.*), includes Zerlinda Davis' testimony about her potential occupancy of the Longwood property during the relevant time period. Davis testified as to the condition of the property, what was needed, and that otherwise it "was a beautiful house." She also testified that the neighborhood it was in "was [a] very nice, beautiful, safe community" with "so many resources *** for kids and for families." Davis compared the Longwood property and the Esmond property and testified the "property on Longwood was bigger, more beautiful, not as much needed to be done." Detective McCafferty testified that the exterior of the house "was nice" and that the living room "looked fine." Detective Purdy described the property as "a single-family split level house." The trial court admitted and the State published photographs of the property to the jury during the period of its theft. Detective Udell testified he executed a search warrant at the Longwood property. Detective Udell testified the kitchen was in disarray and "was unidentifiable as a kitchen because *** the kitchen looked like it was being constructed or worked on. There was cabinets but no counter tops, there was like construction, like home repair items around." The court admitted pictures of the kitchen into evidence and the State published them to the jury.

¶ 56    Considering the record as a whole, we find that Lloyd's testimony as to cost, together with the other proof recited above, affords the basis for a valid finding as to value. *Todaro*, 14 Ill. 2d at 601. As we stated, the jury is permitted to consider the evidence in light of their common knowledge and experiences in life, and the general range of home values in nice neighborhoods is a subject of such common knowledge and experience. It was for the jury to weigh all of the evidence, including the original cost of the home and its current condition, to

determine whether the State proved the fair cash market value beyond a reasonable doubt. Taking the evidence as a whole in a light most favorable to the prosecution, as we must, we hold the State adduced sufficient evidence for a valid finding as to the fair cash market value of the Longwood property at the time of the theft.

¶ 57    Defendant separately argues the State failed to prove the sales price was equal to the properties' fair cash market value for the Wood, Longwood, and Prospect properties because the State failed to adduce evidence "that the cost of the properties was attributable to an arm's length's sale."  Defendant relies upon our supreme court's decision in *Todaro*, 14 Ill. 2d at 601, for the proposition that where proof of the value of stolen property "is required, the criterion is the fair cash market value of the property and not its cost."  *Todaro*, 14 Ill. 2d at 601, citing *People v. George*, 398 Ill. 318 (1947), *People v. Long*, 391 Ill. 529 (1945).  Specifically, regarding the Prospect property, defendant argues the fact the evidence established that the transfer price to HUD was "four times its appraised value" is proof "that the State failed to present reliable testimony for the value of the property at the time in question."  Defendant argues, without citation to authority or evidence, that given the disparity in appraised value and the transfer price, "there are no assurances that the conveyance was at arm's length."

¶ 58    Defendant fails to cite any authority in support of imposing an "arm's length transaction" requirement on the State's evidence of the fair cash market value of real property for purposes of the theft statute.  Defendant only argues that "for real property, *** 'other proof' [in addition to cost, to 'afford [a] basis for a valid finding as to value' (*Todaro*, 14 Ill. 2d at 601[2])] *could be*

---

[2]    "While the *George* case is authority for the proposition that proof of cost alone does not establish the fair cash market value at the time and place of the receipt of the property, the opinion clearly indicates that cost, together with other proof, may afford the basis for a valid finding as to value." *Todaro*, 14 Ill. 2d at 601.

obtained by showing that the sales price was set through an arm's length transaction."

(Emphasis added.) In support of that proposition, defendant relies on this court's decision in

*Cook County Board of Review v. Property Tax Appeal Board*, 384 Ill. App. 3d 472, 480 (2008).

¶ 59    Defendant's reliance on *County Board of Review* is somewhat misplaced, as that case

dealt not with theft of real property but with a property tax assessment of real property. *Cook*

*County Board of Review*, 384 Ill. App. 3d at 473. Nonetheless, in that case this court did find as

follows:

> "Illinois law requires that all real property shall be valued at its fair cash
>
> value, estimated at the price it would bring at a fair, voluntary sale. [Citations.]
>
> Fair cash value is synonymous with fair market value. [Citations.] Market values
>
> generally are the standard to be used in valuing property for tax purposes.
>
> [Citation.]
>
> In the absence of a contemporaneous sale between parties dealing at arm's
>
> length that would be practically conclusive on the issue of market value, valuation
>
> methods are employed to estimate the property's fair market value. [Citation.]
>
> There are three basic valuation methods: the comparison approach, the income
>
> approach, and the reproduction cost approach.
>
> * * *
>
> In the absence of market value set by a contemporaneous arm's-length
>
> sale, [t]he sales comparison approach *** is the preferred method and should be
>
> used when market data [are] available. [Citation.] The sales approach is often
>
> referred to as the market approach because it relies on sales of comparable
>
> properties in the open market to reach a determination of the subject property's

true value." (Internal quotation marks omitted.) *Cook County Board of Review*, 384 Ill. App. 3d at 480-81.

¶ 60    We specifically note this language because defendant later separately argues in effect that the use of the "sales comparison approach" was inappropriate in this case when defendant attacks two of the realtors' testimony in this case based on a Broker Price Opinion (BPO) of the subject properties. There is evidence in the record establishing that a BPO is based on the sales comparison approach which, according to the authority cited by defendant, is "the preferred method and should be used." *Id.* In this case, defendant argues that for the Esmond and Damen properties, "the State's only evidence of the value was the [BPO]." Defendant, citing section 1-10 of the Illinois Real Estate License Act, argues that "under Illinois law, a BPO does not adequately reflect the market value of a property;" rather, it is " '[a]n estimate of the probable selling price of a particular interest in real estate.' 225 ILCS 454/1-10 (West 2018)."[3]

¶ 61    Defendant fails to draw a distinction between "the probable selling price of a particular interest in real estate" and the "fair cash market value." Further, the Real Estate License Act of 2000 draws a distinction between a BPO and an appraisal of property by a State certified real estate appraiser and not between an estimate of probable selling price and fair cash market value. See 225 ILCS 454/1-10 (West 2018) ("A broker price opinion shall not be considered an appraisal within the meaning of the Real Estate Appraiser Licensing Act of 2002."); 225 ILCS 10-45(b)(7) (West 2018) (BPO shall include a statement that "[t]his is a broker price

---

[3]    " 'Broker price opinion' means an estimate or analysis of the probable selling price of a particular interest in real estate, which may provide a varying level of detail about the property's condition, market, and neighborhood and information on comparable sales. *** A broker price opinion shall not be considered an appraisal within the meaning of the Real Estate Appraiser Licensing Act of 2002, any amendment to that Act, or any successor Act." 225 ILCS 454/1-10 (West 2018).

opinion/comparative market analysis, not an appraisal of the market value of the real estate, and was prepared by a licensed real estate broker *** who was not acting as a State certified real estate appraiser"). We fail to see how that distinction makes a difference for purposes of assessing the fair cash market value of stolen property and, regardless, any difference it does make was a factor in the weight to be afforded the testimony and not its competence to establish the elements of the offense. Defendant's argument concerning the Esmond and Damen properties, that the State failed to adduce evidence of their fair market value because the testimony was based on a BPO, fails.

¶ 62    Returning to defendant's "arm's length transaction" argument, as previously noted, defendant has pointed to nothing in the theft statute requiring specific evidence of an arm's length transaction when the State presents evidence of sales price to prove fair cash market value of stolen property. On the contrary, our supreme court has held that "[t]he opinion testimony of one who has sufficient knowledge of the property and its value to give a reasonable estimate, received without objection, is sufficient, in the absence of contrary evidence, to establish value." *Harden*, 42 Ill. 2d at 305-06. Contrary to defendant's argument on appeal, the decision in *People v. Brown*, 36 Ill. App. 3d 416 (1976), is decidedly unhelpful in this regard. In that case, the defendants argued the evidence of the value of the property failed to support a conviction for felony theft. *Brown*, 36 Ill. App. 3d at 420. There, the court did note that to establish "fair cash market value at the time and place of the theft," cost "is not the standard, whether it be original cost or replacement cost." *Id.* "On the other hand, although proof of cost alone is insufficient, cost together with other proof, relating to condition, quality and modernness or obsolescence, may afford the basis for a valid finding as to value." *Id.* at 421. The court found that "none of

the questions, propounded to the witnesses on the issue of value, related to fair cash market value." *Id.*

¶ 63    Here, by contrast, the jury heard extensive "other proof" that bore directly on the fair cash market value of the subject properties at the time and place of the theft including the condition and structure of the homes and the nature and character of the neighborhoods in which they were located.  The additional evidence, beyond mere cost, is additional evidence that "may afford the basis for a valid finding as to value." *Id.*  Regardless, the *Brown* court specifically limited its holding to the facts of that case.  The court specifically wrote that "the nature of the equipment involved here and the absence of evidence relating to fair cash market value together with the other factors mentioned, lead us to conclude that the evidence of value was insufficient to support a conviction for felony theft." *Id.*  We note that the "other factors" at play in *Brown* included the fact that out of a myriad of pieces of stolen stereo equipment, there was no evidence to establish "which items of stereo equipment were found in the defendants' possession." *Id.* at 420.

¶ 64    Moreover, "[i]n [*People v. Hansen*, 28 Ill. 2d 322, 340 (1963)] the Supreme Court held that where, at the time of the theft, the retail market is the only market open for sale, the retail price determines market value." *People v. Briseno*, 2 Ill. App. 3d 814, 816 (1972), citing *Hansen*, 28 Ill. 2d at 340.  This court has held that "a willing seller and a willing buyer for a determined price, establishes the fair market value of merchandise." *People v. Heinz*, 87 Ill. App. 3d 1, 3 (1980).  Most of the authorities involve personal property rather than real property; but we see no reason why, and more importantly defendant has pointed to no authority stating, the principles expressed in the existing authorities do not apply to fair cash market valuation of real property for purposes of the theft statute.  Whether or not the State also adduced evidence

that the transactions to which its witnesses referred when testifying to the value of the properties were "arm's length transactions" goes to the weight to be afforded their testimony and not to its admissibility or its competence to establish fair cash market value. Specifically, the jury heard the testimony concerning the variance between the assessed value of the Prospect property and the transfer cost to HUD. It was for the jury to determine what weight to give that testimony in light of the discrepancy and we will not substitute our judgment for theirs. *Gray*, 2017 IL 120958, ¶ 35, see *Harden*, 42 Ill. 2d at 305-06, *People v. McNeal*, 2019 IL App (1st) 180015, ¶ 33 ("arguments about the persuasiveness of his or her conclusions go to weight not admissibility"). Accordingly, defendant's argument concerning the need for proof of an arm's length transaction fails.

¶ 65 Finally, we now turn to defendant's argument that the "bare assertion of the 106th Street property's value without evidence of the basis of the opinion was insufficient to prove its value beyond a reasonable doubt." Defendant complains on appeal that the only evidence of the value of the 106th property was Riney's opinion the property was worth $190,000 in 2012 and the property sold after June 30, 2015; Riney did not testify how the value in 2012 related to the value in 2015; she did not testify whether the "value" was the "market value" as required by section 5/15-9 of the Criminal Code of 2012 (720 ILCS 5/15-9 (West 2018)[4]); and, there "was no testimony that Riney had any qualification in valuing property or that *** she had ever viewed or visited the 106th Street property[,] [a]s such, Riney's testimony was insufficient to prove the

---

[4]     For the applicability of section 15-9 to real property, as opposed to commercial instruments as its plain language suggests, see 3 Substantive Criminal Law § 19.4(b) (3d ed.) *Value of the property: grand larceny vs. petit larceny*, Wayne R. LaFave ("Modern statutes usually state that market value is to be the ordinary method of valuation.") (citing 720 ILCS 5/15-9 (West 2018)).

property's value beyond a reasonable doubt." The last argument is the quintessential "foundation" objection which the State immediately argued defendant had forfeited. We agree.

¶ 66    The necessary requirements for the admission of opinion evidence include "a foundation establishing personal knowledge of the facts that form the basis of the opinion." *People v. Jones*, 241 Ill. App. 3d 228, 232 (1993).

> "This court has previously held that a defendant's objection to the foundation for the admission of evidence is waived on appeal when no objection on foundational grounds was made to the evidence in the trial court. [Citation.] A timely objection in the trial court as to the foundation of technical evidence is necessary to give the State the opportunity to correct any deficiency in the proof. [Citation.] Moreover, the State's failure to lay the proper technical foundation under Rule 703 is not reviewable under the plain error doctrine. [Citation.]"
> *People v. Sparks*, 335 Ill. App. 3d 249, 254 (2002).

As for defendant's remaining arguments concerning Riney's testimony, we note that as with the other evidence of value in this case her testimony stood unrebutted. "The opinion testimony of one who has sufficient knowledge of the property and its value to give a reasonable estimate, received without objection, is sufficient, in the absence of contrary evidence, to establish value." *Harden*, 42 Ill. 2d at 305-06. Even had defendant not forfeited the issue, we note Riney testified she was "a senior financial crime investigator for mortgage investigation" for Wells Fargo Bank, and the State asked Riney, "Are you familiar with the property that was located at or is located at 1635 West 106th Street in Chicago, Cook County, Illinois?" Riney responded, "Yes, I am." We will not disturb the jury's determination of the credibility of Riney's testimony or the proper weight to afford it (*supra*, ¶ 52, citing *Brown*, 2013 IL 114196, ¶ 48). See, *e.g.*, *People v.*

*Williams*, 201 Ill. App. 3d 207, 219 (1990) ("Defendant maintains that Dr. Reifman's interview was too brief , and too distant from the time of the crimes, to deserve any weight. This argument goes to the weight of the testimony, which is a decision for the trier of fact."). Defendant has forfeited any objection to Riney's "knowledge of the property and its value to give a reasonable estimate." The jury found her testimony "sufficient *** to establish value." Defendant's argument at to the 106th property fails.

¶ 67  In sum, defendant's arguments the State failed to prove the fair cash market value of each of the properties at the time of the theft fail. Accordingly, defendant's conviction and sentence for Class X felony theft are affirmed.

¶ 68                              CONCLUSION

¶ 69  For the foregoing reasons, the circuit court of Cook County is affirmed.

¶ 70  Affirmed.